UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
_____x

DANA STEPHENSON,

                            Plaintiff,         No. 22-CV-24

        -against-

                                              COMPLAINT

EQUIFAX INFORMATION SERVICES, LLC,      Jury Demanded

                          Defendant.
_____x

## COMPLAINT

COMES NOW Plaintiff, Dana Stephenson, by Counsel, and for her Complaint against Defendant, alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an action for actual, statutory and punitive damages, costs, and attorney's fees brought under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681a-x.

2.     Today in America, three major consumer reporting agencies ("CRAs") include Equifax Information Services, LLC ("Equifax"), TransUnion, LLC ("TransUnion"), and Experian Information Solutions Inc. ("Experian").

3.     The FCRA demands of reporting agencies like Equifax, Experian, and TransUnion that they utilize reasonable procedures to assure the maximum

1

possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.     Consumer reporting agencies that create consumer reports, like Equifax, Experian, and TransUnion, are expected to use reasonable procedures designed to ensure the maximum possible accuracy of the information that they report. It is not acceptable for them to simply parrot information received from entities like Bethpage Federal Credit Union ("BFCU"), the loan servicer that a third party sent fraudulent documents to, particularly where a consumer makes a dispute about information reported.

5.     Also, when consumers like Plaintiff dispute the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here BFCU. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.     When such dispute investigations are ongoing and credit reporting of the subject account is also taking place, the furnisher of information must note that the consumer has disputed the information when transmitting account data to CRAs.

7.     Plaintiff brings a claim under § 1681e(b) against Equifax because they reported inaccurate information regarding Plaintiff's BFCU account. When Plaintiff disputed the inaccuracies, Equifax failed to reasonably investigate, also violating § 1681i.

8.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Defendant has complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Defendant has been repeatedly sued by consumers, sanctioned by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had Defendant followed that advice and heeded those warnings, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

9.     The jurisdiction of this Court is conferred by the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

10.    Personal jurisdiction and venue lie in this Court under 28 U.S.C. § 1391(b), inasmuch as Defendant does and transacts business in this District, maintains registered offices within this District, the principal residence of Plaintiff

is in this District, and a significant part of the facts giving rise to Plaintiff's claims occurred here.

## PARTIES

11.    The Plaintiff, Dana Stephenson, is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

12.    Equifax Information Systems, LLC ("Equifax") is an Atlanta limited liability company that is authorized to do business in the State of New Jersey, with offices located in Gibbsboro, New Jersey.

13.    Equifax is a consumer reporting agency, as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.    Upon information and belief, Equifax disburses such consumer reports to third parties under contract for monetary compensation.

15.    Non-party BFCU is a Federal Credit Union with a principal place of business in Bethpage, Long Island, New York.

16.    At all times relevant, BFCU was a "furnisher" of information as defined and governed by the FCRA. 15 U.S.C. § 1681s-2.

## FACTS

17.    "Congress enacted the FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

18.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

19.     Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

20.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

21.     It has long been the law that a CRA, such as Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g., Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), on reh'g sub nom. *Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir.

6

2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016

WL 4544368, at *9 (N.D. Ga. July 22, 2016), report & recommendation adopted, No.

1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable

factfinder could find that merely contacting [the creditor] was not sufficient to

determine whether the disputed information was inaccurate.").

22.     That "grave responsibility" imposed by the FCRA reinvestigation

requirement "must consist of something more than merely parroting information

received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d

Cir.1997).

23.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as
> "[a] detailed inquiry or systematic examination." Am.
> Heritage Dictionary 920 (4th ed. 2000); see Webster's
> Third New Int'l Dictionary 1189 (1981) (defining
> "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

24.     Further, as the Defendant is aware, even though the term

"investigation" is not used in '1681e(b), it is clear that Defendant has a duty to

conduct a reasonable initial investigation pursuant to '1681e(b) as well as '1681i(a)

and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both
> ['1681e(b) and '1681i(a)]. For example, Section 1681e(b)
> requires (1) "reasonable procedures" that (2) "assure" (3)
> "maximum possible accuracy." To "assure" means "to

make sure or certain: put beyond all doubt." Webster's
Third New International Dictionary 133 (1993).
"Maximum" means the "greatest in quantity or highest
degree attainable" and "possible" means something
"falling within the bounds of what may be done, occur or
be conceived . . . ." Id. at 1396, 1771. It is difficult to
imagine how "maximum possible accuracy" could be
guaranteed without an adequate investigation. Likewise,
Section 1681i(a)(1)(A) requires a "reinvestigation,"
necessarily implying that an "investigation" was required
to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

25.     It has long been the law—since 1970 in fact—that:

[W]hen a CRA learns or should reasonably be aware of
errors in its reports that may indicate systematic
problems (by virtue of information from consumers, report
users, from periodic review of its reporting system, or
otherwise), it must review its procedures for assuring
accuracy and take any necessary steps to avoid future
problems. Similarly, it should establish procedures to
avoid reporting information from its furnishers that
appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT

REPORTING ACT (July 2011), at 67.[1]

26.     Today, furnishers such as BFCU and other of the Defendant's

furnishers, have their own independent duties under the FCRA, principally those

found at 15 U.S.C. § 1681s-2. But while the Defendant's duties under § 1681e(b)

---

[1]Available at https://www.ftc.gov/sites/default/files/documents/reports/40-
years-experience-fair-credit-reporting-act-ftc-staff-report-summary-
interpretations/110720fcrareport.pdf.

were enacted in 1970 and have governed since, the duties on furnishers are much more recent, enacted only in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

*Plaintiff's Fraudulent Loan*

27.     On or about February 16, 2019, Plaintiff visited Exclusive Motor Sports with her then-boyfriend.

28.     Plaintiff agreed to help her boyfriend at the time afford a car by becoming a co-signer.

29.     Plaintiff completed credit application documents and the car dealer, Saaed Moslem (Moslem), the owner and manager of Exclusive Motor Sports, told Plaintiff that she was approved for a loan in her name that would cover the full purchase price of the car, a BMW M3, for $23,793.82.

30.     Moslem claimed that the loan was secured with Mid-Hudson Valley Federal Credit Union.

31.     In or around mid-March 2019, several weeks after Plaintiff purchased the car, she reached out to the car dealer to request the loan account number and instruction on how to pay the loan. She also requested copies of all paperwork she had completed at the car dealership.

32.     The car dealer told Plaintiff, for the first time, that the loan had been denied and that the loan documents she had signed were ""null and void."

33.     The car dealer further claimed that he had spoken directly with Plaintiff's then-boyfriend and had sorted out a payment plan with him that did not require Plaintiff's further involvement.

34.     On or about March 25, 2019, without Plaintiff's knowledge, Exclusive Motor Sports submitted loan documents to Mid-Hudson Valley Federal Credit Union in Plaintiff's name that Plaintiff never saw, signed, or approved.

35.     Mid-Hudson Valley Federal Credit Union sent Plaintiff a letter, dated March 28, 2019, informing her that the loan documents (that she had not authorized and did not know about) had been denied.

36.     Having failed to obtain approval from Mid-Hudson Valley Federal Credit Union for the assignment for the fraudulent loan documents, on or about March 28, 2019, Exclusive Motor Sports sent those same forged and fraudulent loan documents to Bethpage Federal Credit Union (BFCU).

37.     BFCU accepted the assignment of the fraudulent loan documents from Exclusive Motor Sports.

38.     Plaintiff discovered the fraudulent loan had been taken out in her name in or about the first week of May, 2019.

39.     Due to the fraudulent loan documents, on or about May 6, 2019, Plaintiff told Moslem to take back the car, which Exclusive Motor Sports did that day.

40.     That same day, Plaintiff contacted BFCU to inform it that she had not authorized the loan and demanded that BFCU cancel the loan. BFCU told Plaintiff that it would refer the matter to its fraud department which would contact her within one day.

41.     BFCU's fraud department never contacted Plaintiff despite multiple attempts on her part to follow-up on the matter. BFCU never provided Plaintiff with an explanation for why the fraud department failed to contact her.

42.     Plaintiff then started to receive collection notices from BFCU demanding payments on the fraudulent loan.

43.     When Plaintiff learned that she was actually being held accountable for the fraudulent activity, she reported the fraud to the police and filed a police report for identity theft.

44.     On or about October 11, 2019, Plaintiff again followed up on the status of her loan with BFCU. BFCU informed her that a fraud investigation was pending, but that the fraudulent loan was considered "charged out."

45.     Plaintiff obtained her credit reports from Defendant Equifax, and learned that BFCU had begun reporting to Defendant Equifax that Plaintiff owed a balance on the loan and had past-due payments, and was "charged off", with a balance past due and owing $19,173.

46.     This reporting was inaccurate, as Plaintiff owed nothing on the fraudulent loan and never authorized or approved of the loan.

47.     On Plaintiff's credit reports, the fraudulent loan is identified as a "charge off," thereby negatively impacting her credit score.

48.     On or around January 31, 2020, Plaintiff disputed the BFCU account with Equifax.

49.     Plaintiff attached proof that the debt was fraudulent, including a police report for the fraudulent transaction.

50.     Equifax did not remove the fraudulent credit line from Plaintiff's credit profile, and instead "verified" it as accurate.

51.     On or around April 15, 2020, Plaintiff again disputed the BFCU account with Equifax, this time also requesting to see the steps Defendant took to investigate the claim.

52.     Plaintiff attached the same proof that the debt was fraudulent, including the police report for the fraudulent transaction, plus an affidavit of Fraud and Forgery along with a Handwriting Exemplar.

53.     Equifax did not remove the fraudulent credit line and again "verified" it as accurate.

54.     Equifax also failed to provide Plaintiff with the steps it had undertaken to investigate the dispute properly.

55.     On or around September 16, 2020, Plaintiff again disputed the BFCU account with Equifax.

56.     Plaintiff attached the same proof that the debt was fraudulent, including the police report for the fraudulent transaction, an affidavit of Fraud and Forgery, and a handwriting exemplar, while also providing additional evidence including internal e-mails from BFCU personnel, demonstrating their conscious negligence. Plaintiff also advised Equifax that Moslem was under indictment in Federal Court for providing false and fabricated information to banks, including to Mid-Hudson Valley FCU in connection with this transaction and other transactions, and attached a copy of the indictment.

57.     Equifax did not remove the fraudulent credit line and again "verified" it as accurate.

58.     Equifax also failed to provide Plaintiff with the steps it had undertaken to investigate the dispute properly.

59.     On or around May 7, 2021, Plaintiff disputed the BFCU account with Equifax.

60.     Plaintiff provided the same evidence as before while adding additional details of the criminal trial the forgers were going through and a forensic handwriting analysis proving the signature on the fraudulent loan did not belong to Plaintiff.

61.     On or about June 4, 2021, Plaintiff provided a supplement to the May 7, 2021 dispute, advising Equifax that Moslem had been convicted of aggravated identity theft of her, and attached the verdict sheet.

62.     Equifax did not remove the fraudulent credit line and again "verified" it as accurate.

63.     Equifax again failed to provide Plaintiff with the steps it had undertaken to investigate the dispute properly.

*Defendant Did Not and Does Not Conduct Any*
*Investigations of Most Consumer Disputes*

64.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Defendant to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Defendant uses a vendor, previously known as Intelenet Global Services and now as Teleperformance.

65.      This dispute processing vendor is not hired to perform an actual FCRA investigation. Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

66.      In fact, Defendant strongly encourages consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online

14

dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax. It gets sent to Defendant's creditor customer (such as BFCU) for its sole review and consideration.

67.   Here is how the written mail dispute process actually works for Defendant: a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes and scans them into a batch of other disputes.

68.   Defendant then forwards the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

69.   Teleperformance agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

70.   Defendant has taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court just

last year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

71.     Regardless of whether or not these statements are correct, Defendant believes that it cannot direct, control, manage or reliably influence the employees of their third-party Indian outsource vendor.

72.     Defendant did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely relinquished their control over the disputes by allowing them to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

73.     Defendant had continued to report derogatory BFCU reporting on Plaintiff's credit reports, despite being notified that this information was false.

16

74.     Plaintiff had been attempting to resolve these matters with Defendant and her credit was significantly destroyed by Defendant's failure to correct their inaccurate reporting:

(a)     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

(b)     Loss of credit and damage to reputation;

(c)     Monies lost by attempting to fix her credit, *e.g.*, communication costs, postage for disputes;

(d)     Loss of time attempting to cure the errors;

(e)     Missed financial opportunities caused by the loss of credit and time.

(f)     Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; and

(g)     Stress associated with attempting to resolve this matter

### *Defendant's Conduct was Willful*

75.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. at 69.

76.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

77.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The Defendant's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendant's "grave responsibilities" to ensure accuracy has not changed.

78.     Defendant has received thousands of disputes and other complaints regarding the creditor at issue in this case-sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

79.     The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to Defendant, and/or to other government agencies, attorneys, or non-profit organizations. Defendant regularly receives unredacted consumer dispute details from this database.

80.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

81.     Further, over 35,000 of the CFPB complaints against Equifax were based largely on their failure to reasonably investigate consumer disputes.

82.     Just in the last 12 months alone, Equifax has been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade

83.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendant on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

84.     Equifax has had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g., Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x

19

896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or.

Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act

reasonably under the FCRA by deferring entirely to another source of

information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066,

1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to

verify the accuracy of plaintiffs' account. Many courts, including this one, have

concluded that where a CRA is affirmatively on notice that information received

from a creditor may be suspect, it is unreasonable as a matter of law for the agency

to simply verify the creditor's information through the ACDV process without

additional investigation.").

85.     Equifax has even been warned by one of its home state District Courts,

the Southern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible
> for investigating the dispute, once notified of it by the
> reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998).
> According to Equifax, the reporting agency's duty under §
> 1681i is fulfilled once it forwards the complaint to the
> creditor, the entity in the best position to undertake an
> accurate investigation. Under § 1681s-2(b), furnishers of
> information, such as creditors, have certain duties to
> investigate consumers' disputes. Yet, this does not end
> the inquiry, or establish that the reporting agency has no
> responsibility beyond serving as a conduit for consumers'
> complaints.
>
> To the contrary, a credit reporting agency does not
> conduct a reasonable investigation by deferring entirely to
> another source of information. "In a reinvestigation of the

> accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." Stevenson, 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.*, 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

86.    Defendant has also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

87.    In 2015, a large group of state Attorneys General forced a consent order from the Defendant by which they and the other credit reporting agencies were required to develop procedures necessary to comply with the FCRA. The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

88.    The AG Settlement also required the Defendant to conduct significant research and data gathering-even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendant did not meaningfully comply with the AG Settlement in these regards.

89.    Defendant is also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019. ("NCLC Report").[2]

90.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process

---

[2]Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf

required by the Fair Credit Reporting Act (FCRA) that
was intended to fix these problems remains ineffective
and biased.

91.     Among many of the Defendant's accuracy failures, the NCLC Report

discovered:

    a.    Insufficient Information Conveyed and Considered in Investigation.
Credit bureaus use the highly automated e-OSCAR system to convey
disputes to furnishers, primarily using shorthand two- or three-digit
codes, and at most only a line or two of text in a minority of instances.
The credit bureaus use the same four or five codes over 80% of the
time.

    b.    Failure to Transmit Information Submitted by the Consumer. Credit
bureaus failed to send supporting documentation submitted by
consumers to furnishers, in clear violation of the FCRA.

    c.    Perfunctory Credit Bureau Investigations. Credit bureaus limit the
role of their employees who handle disputes, or of the foreign workers
employed by their offshore vendors, to little more than selecting these
two-or-three-digit codes. Workers do not examine documents, contact
consumers by phone or email, or exercise any form of human discretion
in resolving a dispute.

    d.    Credit Bureaus Always Side with Furnishers. Credit bureaus are
universally biased in favor of furnishers and against consumers in
disputes. In a practice known as "parroting," credit bureaus blindly
adopted the response of the furnisher without performing any
independent review.

NCLC Report at 6.

92.     Despite the notice and judicial, regulatory and public interest

criticism, Defendant has refused to change their dispute investigation process

because it would cost too much money to do so.

93.     Defendant's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with modest imposition.

## Count I
## VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681e(b)

94.     Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

95.     Defendant willfully violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the Plaintiff's credit reports and credit files they published and maintained concerning the Plaintiff.

96.     As a result of Defendant's violations of 15 U.S.C. § 1681e(b) Plaintiff suffered actual damages, including but not limited to: loss of the ability to purchase and benefit from credit, reduction in credit score, damage to reputation, time and attention taken away from work, embarrassment, humiliation, and other emotional distress.

97.     Further, after Plaintiff's detailed disputes put Defendant on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of BFCU, Equifax ignored such information and did not use any human or substantive review

to confirm and verify that their procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

98.    Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and Defendant did so after receiving notice of these inaccuracies.

99.    The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

100.   As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff is entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o as well as punitive damages to be determined by the Court, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

101.   Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## Count II
## VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i

102.   Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

103.    Defendant willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's consumer files after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files; and by relying upon verification from a source it has reason to know is unreliable.

104.    Further, Equifax violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified each CRA directly of their disputes, that party—the consumer reporting agency who received the disputes— must investigate those disputes. The statute does not provide for someone other than Equifax conducting the investigation.

105.    Yet, Equifax used an unrelated third-party, Teleperformance, over which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax therefore violated § 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

106.    As a result of Defendant's violations of 15 U.S.C. § 1681i, Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or §

1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

107.   Defendant's conduct, action, and inaction was willful, rendering Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

108.   Plaintiff is entitled to recover costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages against Defendant; for attorney's fees and costs; for prejudgment and post-judgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

### Jury Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:        January 3, 2022

Respectfully submitted,
DANA STEPHENSON

By:    /s/ *Brian L. Bromberg*
       Brian L. Bromberg
       One of Plaintiff's Attorneys

Attorneys for Plaintiff:

27

Brian L. Bromberg
Bromberg Law Office, P.C.
352 Rutland Road #1
Brooklyn, NY 11225
Tel: (212) 248-7906

Thomas R. Breeden*
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
Tel: (703) 361-9277

\* Mr. Breeden will file a request for admission *pro hac vice*.